IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

TAMMY MARIE TURLEY,

       Plaintiff,

v.                                Case No.: 3:19-cv-00769

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's

request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On October 1, 2015, Tammy Marie Turley ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of February 1, 2015 due to bipolar affective disorder, ADHD, limited mobility, asthma, anxiety, obesity, and complete thyroid removal. (Tr. at 242-55, 295). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 15). Claimant then filed a request for an administrative hearing, which was held on March 27, 2018 before the Honorable Jerry Meade, Administrative Law Judge. (Tr. at 38-69). By written decision dated July 26, 2018, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 12-37). The ALJ's decision became the final decision of the Commissioner on August 26, 2019 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8, 9). Claimant filed a Brief in Support of Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 10, 11). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 39 years old on her alleged onset date and 42 years old on the date

of the ALJ's decision. (Tr. at 29). She completed high school and previously worked as a licensed cosmetologist, home health aide, and a deli worker in a grocery store. (Tr. at 59-60, 63, 296-97).

### III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation

4

resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2018. (Tr. at 17,

5

Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since February 1, 2015, the alleged disability onset date. (Tr. at 17-18, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: mild osteoarthritis of the right knee, carpal tunnel syndrome, mild degenerative disc disease of the thoracic spine, scoliosis of the lumbar spine, chronic obstructive pulmonary disease (COPD), asthma, bipolar affective disorder, borderline intellectual functioning, and cannabis use disorder with dependence. (Tr. at 18, Finding No. 3). The ALJ considered Claimant's vison problems, sleep apnea, gastroesophageal reflux disease (GERD), urge and stress incontinence, hypothyroidism, diabetes mellitus, peripheral neuropathy, mood disorder, depression, anxiety disorder, panic disorder with agoraphobia, post-traumatic stress disorder, and history of substance abuse, but found that the impairments were non-severe. (Tr. at 18-20). The ALJ further considered Claimant's neck pain and attention deficit hyperactivity disorder (ADHD), but concluded that they were not medically determinable impairments. (Tr. at 20).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-22, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c). She can never climb ladders, ropes, or scaffolds. She must avoid concentrated exposure to vibrations; irritants such as fumes, odors, dust, gases, and poorly ventilated areas; and hazards such as moving machinery and unprotected heights. She can frequently (but not repetitively) handle and finger with both hands. The claimant is limited to simple, routine, and repetitive tasks involving only one or two steps. She can only work in a low-stress job (defined as a job that requires only occasional decision making and has only occasional

6

changes in the work setting). She can have only occasional interaction with the public.

(Tr. at 22-29, Finding No. 5).

At the fourth step, the ALJ determined that Claimant could not perform her past relevant work. (Tr. at 29, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 29-30, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1975 and was defined as a younger individual on the alleged disability onset date; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of Claimant's transferable job skills. (Tr. at 29, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a night cleaner or laundry worker at the medium exertional level, hotel maid or garment bagger at the light exertional level, or inspector or sorter at the sedentary exertional level. (Tr. at 29-30, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 30-31, Finding No. 11).

## IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant alleges that the ALJ failed to properly consider the medical evidence concerning her mental and physical impairments and incorporate it into the credibility determination and RFC analysis. (ECF No. 10 at 4). Claimant cites three statements by

her treating medical providers, Dr. Patton, Dr. Holroyd, and Ms. Wilson, regarding her ability to engage in substantial gainful activity. (*Id.* at 6).

In response to Claimant's challenges, the Commissioner argues that Claimant has not proven disability pursuant to the Social Security Act and Regulations. (ECF No. 11 at 9). The Commissioner further asserts that substantial evidence supports the ALJ's finding that Claimant's allegations were not entirely consistent with the medical evidence and other evidence in the file. (*Id.* at 10-13).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A. *Treatment Records*

On February 4, 2016, Claimant's primary care physician, Ross Patton, M.D., diagnosed Claimant with bipolar disorder and depression with anxiety. (Tr. at 569). Claimant was prescribed lithium. (Tr. at 568). The following month, on March 13, 2016, Claimant presented to the Emergency Department at Cabell Huntington Hospital complaining of rib-trunk pain with shortness of breath and wheezing. (Tr. at 518). She stated that her symptoms began two days earlier, and they were worsening. (*Id.*). Claimant denied syncope or dizziness. (*Id.*). Claimant's respiratory examination revealed mild diffuse wheezes, but her breath sounds were equal and there was no evidence of tachypnea. (Tr. at 519). Claimant's chest x-ray showed clear lung fields and no abnormalities. (*Id.*). Claimant was diagnosed with myofascial strain of the thorax and asthma, and she was discharged to follow up with her primary care physician. (Tr. at 520).

Claimant reported to Dr. Patton on June 10, 2016 that lithium was helping her bipolar symptoms. (Tr. at 775). Her blood glucose also improved significantly on metformin, and Claimant was complying with a diabetic diet for the most part, as well as going to the gym three times per week. (*Id.*). Claimant presented to Dr. Patton again on December 12, 2016 because she was entering school to become a certified nurse assistant (CNA), and she needed a "physical" to start the program. (Tr. at 735). Claimant reported back pain that extended from her neck to the bottom of her spine and sciatica in her right leg. (*Id.*). Claimant told Dr. Patton that she had a history of "ruptured discs" and was seeing a chiropractor, and she would also like to see a pain specialist. (*Id.*). Claimant had discontinued metformin due to gastrointestinal symptoms, but her blood glucose was improved due to weight loss. (*Id.*). Claimant lost 44 pounds since March 2016, and she now weighed 247 pounds. (Tr. at 735, 737). She continued going to the gym once per week. (*Id.*). Claimant advised Dr. Patton that lithium was still helping her bipolar disorder, and she denied having any manic or depressive symptoms. (*Id.*). Claimant's physical examination was entirely within normal limits. (Tr. at 737).

An x-ray of Claimant's lumbar spine on January 18, 2017 showed mild degenerative changes at the facet joints inferiorly, but no acute bony abnormality or subluxation. Claimant's vertebral heights were maintained with no instability on flexion or extension. (Tr. at 687). When Claimant followed up with Dr. Patton on March 14, 2017, she complained of intermittent numbness in her hands and forearms. (Tr. at 711). She stated that she had symptoms when she woke up in the morning, went to sleep, and after using her hands repetitively. (*Id.*). Dr. Patton diagnosed Claimant with peripheral neuropathy. (Tr. at 714).

9

On April 24, 2017, Claimant presented to Dominika Lozawka, M.D., for EMG and nerve conduction studies to evaluate her hand complaints. (Tr. at 695). Claimant advised Dr. Lozawka that she currently used her hands as a landscaper. (*Id*.). Claimant's test results were consistent with bilateral carpal tunnel syndrome without cervical radiculopathy. (*Id*.). Claimant followed up with Dr. Patton on May 22, 2017. She reported increased moodiness and irritability. However, she stated that was working as a home health aide. (Tr. at 690). Dr. Patton adjusted Claimant's medication for bipolar affective disorder and referred her to orthopedic surgeon, David Rupp, M.D., for evaluation of her carpal tunnel syndrome. (Tr. at 693). Claimant told Dr. Patton at this visit that she did not smoke. (Tr. at 690).

On June 28, 2017, Dr. Patton recorded that Claimant was taking her lithium incorrectly by ingesting it all in the morning rather than three times per day. (Tr. at 663). As a result, she was suffering manic episodes and tried to "get into Riverpark and Prestera" for in-patient treatment, and she also went to St. Mary's Medical Center, but she was evaluated and released rather than admitted. (*Id*.). Claimant was instructed to take lithium three times per day rather than all at once, and her moods and manic episodes improved significantly. (*Id*.). Claimant was working full time. (Tr. at 665). She still complained of anxiety, and Dr. Patton adjusted her dosage of clonazepam. (Tr. at 665, 666). She exhibited normal judgment, thought processes, orientation, concentration, mood, and affect. (Tr. at 666). Dr. Patton diagnosed Claimant with bipolar disorder in partial remission, anxiety, and depression. (*Id*.).

Dr. Rupp examined Claimant on June 21, 2017. Claimant advised him that she was working as a hairdresser. (Tr. at 667). On examination, she had full range of motion and normal motor function in both wrists. (Tr. at 670). She had positive results

on the Phalen's test and Tinel's sign,[1] but negative Finkelstein's and ulnar grind tests for triangular fibrocartilage complex (TFCC) pathology. (*Id.*). Dr. Rupp offered to give Claimant injections to treat her symptoms, but she declined. (*Id.*).

On October 5, 2017, Claimant presented as a new patient to resident psychiatrist Meredith Bentley, D.O., in consultation with psychiatrist Suzanne Holroyd, M.D. (Tr. at 870). Claimant stated that she was previously non-compliant with psychiatric medication, but she had been compliant for the past two months. (Tr. at 870). She was taking lithium and clonazepam, which were prescribed by her primary care physician and controlled her symptoms well. (*Id.*). In addition to medication, Claimant saw psychologist, Emily Wilson, M.A., on a weekly or bi-weekly basis for mental health therapy. (Tr. at 872). Claimant was involved in her church and was employed as a home health aide for two companies: Hall's Assisted Living and A & L Home Services. (Tr. at 873). She stated that she enjoyed her work and her manic episodes were well controlled, but she intermittently felt depressed and also had trouble sleeping, felt anger toward people who wronged her, suffered anxiety and panic symptoms one or twice per week, had a history of abuse by family members, and had nightmares and flashbacks at least weekly. (Tr. at 870-71). Claimant stated that she smoked one-half pack of cigarettes per day approximately since the age of 10 years old. (Tr. at 873). She also smoked marijuana daily for the past 30 years and relapsed using methamphetamine earlier that year. (*Id.*). However, Claimant denied abusing other substances. (*Id.*). Dr. Bentley diagnosed Claimant with bipolar disorder in partial remission, panic disorder with agoraphobia and moderate panic attacks, severe

---

[1] The Phalen's test and Tinel's sign are used to diagnose carpal tunnel syndrome. http://www.lakeoswegoplasticsurgery.com/hand/hanfind_carpal_tunnel_syndrome_diagnosis_addit ional_tests.html

dependence on cannabis, and post-traumatic stress disorder. (Tr. at 875). She planned to continue Claimant's prescriptions for lithium and clonazepam, and she added Depakote to be taken at bedtime to target insomnia and provider further mood stabilization given Claimant's reported irritability and cycling of moods. (Tr. at 876).

Claimant followed up with Dr. Bentley on October 26, 2017. She complained that her husband and daughter felt that she was faking all of her medical problems and they told her that it was "all in her head." (Tr. at 849). She quit one of her home health jobs, and she was hoping that the decrease in income would allow her to "get her medical card back." (*Id*.). Claimant continued to see a therapist weekly or bi-weekly, but she did not notice much improvement in her mood from Depakote. (*Id*.). Dr. Bentley again diagnosed Claimant with bi-polar disorder in partial remission. (Tr. at 852). She assessed that Claimant's symptoms were moderately controlled on her medications, and her mood was somewhat improved since her last visit. (*Id*.). Dr. Bentley increased Claimant's dosage of Depakote and renewed her prescriptions for lithium and clonazepam. (*Id*.).

Claimant advised Dr. Bentley during her subsequent visit on December 7, 2017 that her mood was more stable. (Tr. at 843). Claimant felt more depressed that time of year, but she explained that it happened every Christmas. (*Id*.). Nevertheless, her energy level was high; she was sleeping well; her symptoms were moderately controlled on medications; and she continued to see a therapist. (Tr. at 843, 846). Dr. Bentley renewed Claimant's medications and noted that she would possibly decrease Claimant's dosage of clonazepam at the next appointment. (*Id*.).

On December 24, 2017, Claimant presented to the emergency room at Cabell Huntington Hospital after she fell on a slick front porch at her friend's home. (Tr. at

12

631). Claimant related that she landed on her back and buttocks. She felt pain in her back and left knee for which her mother gave her Percocet. (*Id.*). Claimant's lumbar spine CT showed scoliosis, but no fracture or subluxation. (Tr. at 634). The CT of her thoracic spine was likewise negative for fracture of subluxation, but showed minor chronic depression of the T11 endplate and mild degenerative disc disease. (Tr. at 635).

Claimant presented for a consultation with plastic surgeon, Peter Ray, M.D., on January 23, 2018 regarding excess skin due to weight loss. Claimant stated that the sagging skin interfered when she leaned over at work and also required her to buy oversized work clothing. (Tr. at 624). Claimant related that she went back to school to become a CNA in 2017, and she was working full time. (Tr. at 624, 626). She admitted that she was a current smoker. (Tr. at 626). Dr. Ray planned to seek insurance approval to perform a panniculectomy. (Tr. at 630).

On February 6, 2018, Claimant slipped on ice at her home and fell on her left elbow. (Tr. at 594). She went to Cabell Huntington Hospital where x-rays revealed a closed nondisplaced fracture of the coronoid process of her left ulna. (*Id.*). Claimant was prescribed pain medication and her arm was put in a splint. (*Id.*). On March 7, 2018, Claimant followed up with Luis Bolano, M.D., at Scott Orthopedic Center. Her elbow injury was healing routinely, and Dr. Bolano instructed her to discontinue use of the sling and participate in physical therapy. (*Id.*).

Claimant saw Dr. Patton the following day, on March 8, 2018. She advised that she was not going back to her psychiatrist and would instead continue on lithium and Depakote prescribed by Dr. Patton. (Tr. at 608). She stated that she was not as moody, had less anger, and was also doing relaxation techniques to calm herself. (*Id.*). She was under increased stress from caring for her mother, who was dying. (*Id.*). Claimant was

not using a CPAP machine any longer, and her asthma was under good control on Flovent and Pro-Air. (*Id.*). Claimant was mostly following her diabetic diet. (*Id.*). She had lost 88 pounds since March 2016 and 97 pounds since December 2015. (*Id.*). She currently weighed 203 pounds. (Tr. at 611). Claimant reported that she continued to have pain in her right knee since she fell in December 2017. (Tr. at 608). She stated that it hurt to bend her knee or bear weight. (*Id.*). Her x-ray showed mild osteoarthritis. (Tr. at 607).

### B. Evaluations and Opinions

On July 31, 2013, psychologist, Lisa Tate, M.A., performed a mental status examination of Claimant. Claimant reported being diagnosed with bipolar disorder many years earlier and with attention deficit hyperactivity disorder as a child. (Tr. at 384). Claimant also purported to have a learning disability in reading and reading comprehension. (*Id.*). Claimant told Ms. Tate that she was in behavior disorder classes beginning in junior high, and she repeated the twelfth grade, but graduated from high school. (*Id.*). According to Claimant, she did not read or write well enough to complete a job application, and she required assistance reading and comprehending her mail. (*Id.*). Claimant also reported that she had suffered from anxiety for longer than six or seven years, and it was worsening. (*Id.*). On examination, Claimant's insight was fair and her recent memory was mildly deficient, but her orientation, mood, affect, thought content and processes, perception, judgment, immediate and remote memory, concentration, and psychomotor behavior were all within normal limits. (Tr. at 385-86). Ms. Tate diagnosed Claimant with a mood disorder, not otherwise specified, and an anxiety disorder, not otherwise specified. (Tr. at 386).

On November 30, 2015, another psychologist, Angela Null, M.S., performed a mental status examination of Claimant. Claimant stated that she was previously diagnosed with bipolar disorder, but she was not currently receiving any mental health treatment. (Tr. at 460). She was mildly anxious, did not identify the correct month or date, and her memory, concentration, and social interaction during the examination were mildly deficient. (Tr. at 461-62). However, Claimant's appearance, attitude/behavior, orientation, speech, affect, thought processes and content, perception, judgment, insight, psychomotor behavior, persistence, and pace were within normal limits. (*Id*.). Her typical activities included talking on the telephone to her mother daily and to her brother monthly, scrap booking, working on puzzles, and attending medical appointments and church services. (Tr. at 462). Ms. Null diagnosed Claimant with moderate major depressive disorder and panic disorder. (*Id*.).

On December 2, 2015, Kip Beard, M.D., performed an Internal Medicine Examination of Claimant. Claimant alleged that she suffered from asthma, limited mobility, obesity, and complete thyroid removal after which she gained 100 pounds. (Tr. at 450). Claimant was five feet tall and weighed 292 pounds. (Tr. at 452). Claimant's gait was a "bit cumbersome" due to her body habitus, but it was not unsteady or limping, and she did not require ambulatory aids. (*Id*.). Claimant's grip strength was reduced, but she could button, pick up coins, and write with her dominant hand without difficulty, and her range of motion in her hands was unrestricted. (Tr. at 453). Dr. Beard's examination of Claimant's cervical spine yielded normal results, and she had normal range of motion in her lumbar spine with the exception of expressing pain at 70 degrees when bending forward. (*Id*.). She could stand on one leg and her straight leg raising tests were normal. (*Id*.). Claimant had mild paravertebral

tenderness, but no muscle spasm or muscle weakness; her sensation was intact; and she could heel, toe, and tandem walk. (*Id.*). She could squat halfway to the floor, reporting that her knees and back bothered her when doing so. (*Id.*). Claimant had some slight crepitus in her knees without pain, tenderness, redness, warmth, or swelling. (*Id.*). She could flex her knees to 130 degrees and extend them normally. (*Id.*). Claimant reported using an inhaler or nebulizer each day and receiving steroid treatments at least a few times per year, but she conceded that she did not require hospital visits for asthma in the past two years and had never required oxygen therapy. (Tr. at 450). Claimant stated that she did not smoke. (Tr. at 450, 451). She had decreased breath sounds and some exertional dyspnea consistent with asthma, but no wheezing, rales, or rhonchi. (Tr. at 452, 454). Her spirometry test showed very mild breathing restriction with improvement post-bronchodilation. (Tr. at 454, 457). Dr. Beard assessed that Claimant's crepitus and mild motion loss in her knees was indicative of early osteoarthritis, but he noted that Claimant did not have any inflammatory arthritis. (*Id.*). Overall, he recorded that Claimant expressed minimal pain due to her back and knee complaints and suffered only mild motion loss with forward bending without neurological compromise. (*Id.*).

On December 17, 2015, Hedy Mountbatten-Windsor, M.D., assessed Claimant's physical RFC based upon her review of Claimant's records. She opined that Claimant could perform work at the medium exertional level with occasional postural activities, except that Claimant could not climb of ladders, ropes, or scaffolds. (Tr. at 110). Additionally, Dr. Mountbatten-Windsor assessed that Claimant should avoid concentrated exposure to extreme cold or wetness and even moderate exposure to vibration, fumes, or hazards. (Tr. at 111). She cited in support of her assessment

Claimant's allegations of asthma, obesity, limited mobility, and prior thyroid removal, as well as Claimant's December 2015 consultative examination report. (*Id.*). Pedro F. Lo, M.D., affirmed Mountbatten-Windsor's RFC assessment on May 11, 2016. (Tr. at 125-27).

On December 23, 2015, Timothy Saar, Ph.D., performed a Psychiatric Review Technique based upon his review of the record. Dr. Saar concluded that Claimant had non-severe mental impairments; only mild limitations in social functioning and maintaining concentration, persistence, or pace; and no restriction in activities of daily living or episodes of decompensation of extended duration. (Tr. at 108). Paula J. Bickham, Ph.D., affirmed Dr. Saar's assessment on May 11, 2016. (Tr. at 137-38).

On July 26, 2017, Dr. Patton authored a letter, stating that Claimant "had difficulty being gainfully employed" due to "chronic medical problems." (Tr. at 662). On March 7, 2018, Dr. Bolano wrote a letter, advising that Claimant was treated in his office on March 7, 2018 and could not return to work until March 30, 2018. (Tr. at 273). The following day, he completed a Family and Medical Leave Act (FMLA) form, stating that Claimant could not lift more than five pounds and had limited use of her arm from February 7, 2018 to March 7, 2018 due to her elbow injury. (Tr. at 276). Dr. Bolano estimated Claimant's period of incapacity from her injury and treatment to last from March 7, 2018 to May 2, 2018. (Tr. at 277).

On March 16, 2018, Dr. Holroyd responded to interrogatories drafted by Claimant's counsel. She stated that bipolar disorder limited Claimant's ability to work, but Dr. Holroyd was unsure whether Claimant could engage in competitive employment on a consistent basis because she did not know Claimant well enough to respond to the question. (Tr. at 841). On March 27, 2018, Ms. Wilson responded to the

17

same set of interrogatories drafted by Claimant's counsel. Ms. Wilson opined that Claimant could not engage in competitive employment on a consistent basis. (Tr. at 877). She noted that, in addition to physical problems, Claimant struggled with mood fluctuations causing significant impairment in interpersonal relationships. (*Id*.). Ms. Wilson listed that Claimant suffered from moderate bipolar disorder. (*Id*.). She also stated that Claimant's cognitive and academic functioning was in the borderline range. (Tr. at 878). Ms. Wilson assessed that Claimant was mildly limited in understanding, remembering, and carrying out simple instructions; moderately limited in making judgment on simple work-related decisions, understanding and remembering complex instructions, and interacting appropriately with the public; and markedly limited in carrying out complex instructions, making judgments on complex work-related decisions, interacting appropriately with supervisors and co-workers, and responding appropriately to usual work situations and changes in a routine work setting. (Tr. at 879-80). Ms. Wilson cited Claimant's bipolar disorder and borderline intellectual functioning as the bases for her assessment. (*Id*.).

### C. Claimant's Statements

Claimant testified during her administrative hearing on March 27, 2018 that she lived in a trailer with her 17-year old daughter. (Tr. at 42). She was four feet and 11 inches tall, and she weighed 196 pounds. (Tr. at 43). Claimant stated that she weighed 400 pounds four or five years earlier, but she lost a significant amount of weight after resuming medications. (*Id*.). Claimant testified that she suffered from manic bipolar disorder, panic attacks, the "early stages of COPD," asthma, and chronic pain in her back and leg. (Tr. at 45-49). She reported that she was currently on FMLA leave due to her recent elbow injury. (Tr. at 50). She worked for A & L Home Health and Training

as a home health aide for four hours in the morning and two hours in the evening. (Tr. at 50-51). She swept, mopped, and dusted for her morning client, but the client let her sit down in-between tasks. (*Id.*). Claimant testified that she was written up at least 28 times in a six-month period for not obeying company rules, including sharing her personal life with clients and taking medication in front of clients. (*Id.*). However, she had not been written up since working for her existing clients for the past four or five months because they did not make any complaints about her. (Tr. at 52). Claimant testified that she had always seen a psychologist for her mental conditions. (*Id.*). She admitted that she still smoked marijuana daily. (Tr. at 54). However, Claimant denied ever using heroin, and claimed that the last time that she abused methamphetamine was over a year earlier. (Tr. at 61).

## VI.    **<u>Standard of Review</u>**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility

determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

**VII.  Discussion**

Claimant challenges the ALJ's analysis of her subjective symptoms, treating providers' opinions, and RFC. The issues are considered below, in turn.

### A. Subjective Symptom Analysis

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory

findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the

individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id*. at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id*. at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ clearly performed the two-step process. The ALJ noted Claimant's allegations concerning her manic bipolar disorder, panic attacks, COPD, asthma, past thyroidectomy, and elbow fracture. (Tr. at 23). The ALJ also discussed in detail the evidence concerning Claimant's carpal tunnel syndrome and asthma, and her psychological, back, and right knee impairments. (Tr. at 24-25). Ultimately, after

considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 25). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. (*Id.*). The ALJ noted that, despite her allegations, Claimant reported that she was going to the gym three times per week in June 2016 and once per week in March 2017. (*Id.*). She also needed a physical in March 2017 because she was returning to school for her CNA license, and she was caring for her mother who was terminally ill. (Tr. at 25, 26). Claimant was working as a home health aide in May 2017 and as a hairdresser in June 2017. (*Id.*). The ALJ further cited that Claimant's psychological symptoms were much improved when she took her Lithium as prescribed. (*Id.*). Claimant was very involved in her church in October 2017, and her energy level was high, and she was cleaning more in December 2017. (Tr. at 26). In January 2018, Claimant stated to a medical provider that she was working full time as a home health aide for two different companies. (Tr. at 25). Her chief concern was all of her excess skin from her successful weight loss. (*Id.*).

Claimant does not offer any argument to dispute the ALJ's above analysis or conclusions. Rather, Claimant simply lists her impairments and states that the ALJ did not fairly and reasonably evaluate her credibility in light of the medical evidence of record considered in its totality. (ECF No. 10 at 6). To the contrary, the record clearly supports that ALJ's analysis and findings. The ALJ found that Claimant's allegation of disability was inconsistent with her ability to work during the relevant period, and the record substantially supports this assessment. Claimant alleged disability beginning in

24

February 2015, although she later worked as a landscaper in April 2017, full time as a hairdresser in June 2017, and as a home health aide in October 2017, a job which she reportedly enjoyed. (Tr. at 665, 667, 695, 870, 873). Thereafter, Claimant was working full time in January 2018 and testified during her administrative hearing in March 2018 that she was employed as a home health aide for four hours in the morning and two hours in the evening. (Tr. at 50-51, 626). She swept, mopped, and dusted, sitting down in-between activities, and had no difficulties dealing with her current clients. (Tr. at 50-52). Claimant was on FMLA leave and participating in physical therapy because she slipped on ice at her home and injured her elbow in February 2018. (Tr. at 49-50, 594). Claimant's orthopedic surgeon indicated that Claimant's elbow injury was healing routinely and estimated that Claimant could return to work at the beginning of May 2018. (Tr. at 277, 594).

Claimant also lost a significant amount of weight during the relevant period, related to medications and diet compliance. (Tr. at 43, 624). She weighed 196 pounds in March 2018, as compared to her weight of 400 pounds four or five years earlier. (Tr. at 43). As the ALJ referenced, Claimant also went back to school to become a CNA in 2017 despite her alleged symptoms. (Tr. at 624, 711). The ALJ further considered Claimant's activities including her involvement in church in October 2017 and caring for her mother in March 2018. (Tr. at 608, 873).

Regarding Claimant's physical impairments, the ALJ noted Claimant's allegations of right knee pain, but cited Claimant's right knee x-ray in March 2018, which showed only mild osteoarthritis. (Tr. at 24, 607). The ALJ also considered Claimant's carpal tunnel syndrome, but cited that Claimant could pick up coins and write without difficulty during her December 2015 consultative examination, she had

full range of motion and negative Finkelstein's and Ulnar grind testing in June 2017, and she worked in jobs using her hands despite such impairment. (Tr. at 24, 25, 453, 670). Regarding Claimant's complaints of back pain, the ALJ pointed to Claimant's mild objective test results showing only scoliosis and mild degenerative disc disease, lack of neurological compromise, and ability to stand on one leg alone with normal range of motion. (Tr. at 24, 450, 453, 634, 635, 687). In terms of asthma, the ALJ cited that Claimant continued to smoke, but her asthma was nevertheless under good control on only Flovent and Pro-Air as late as March 2018, and she did not require hospital visits for asthma or oxygen therapy. (Tr. at 24, 608, 626). Finally, regarding Claimant's mental impairments, the ALJ observed that Claimant consistently reported improvement from lithium when she took the medication as instructed. (Tr. at 25, 608, 663, 711, 775, 852, 870).

As shown above, the ALJ properly considered Claimant's statements, her daily activities, and the medical evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. Claimant offers nothing to rebut the ALJ's well-reasoned conclusions and specific citations to the record. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

### B. Weight of Opinions

Claimant argues that the ALJ did not properly consider three statements from her treating providers regarding her ability to work. When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the

nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2).

The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[2] *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic

---

[2] The special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). However, Claimant's applications were filed in 2015, and the treating physician rule applied to her claims.

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;

    4. How the vocational factors of age, education, and work experience apply; and

    5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

    In this case, the ALJ expressly considered the statements identified by Claimant. First, the ALJ considered Dr. Patton's July 2017 letter, stating that Claimant had difficulty being gainfully employed due to "chronic medical problems." (Tr. at 26, 662). The ALJ explained that an assertion that a claimant is unable to work is not a medical opinion, but it is rather an administrative finding on an issue reserved to the Commissioner because it is dispositive of the disability application. (Tr. at 26-27). Thus, the ALJ noted that he was not required to analyze the six regulatory factors, but he was required to consider Dr. Patton's statement. (Tr. at 27). The ALJ gave the statement little weight because Dr. Patton failed to express Claimant's functioning in terms of specific limitations, such as how much Claimant could lift, carry, sit, or stand, and because the ALJ found the statement to be inconsistent with the objective evidence

of record. (*Id.*).

Substantial evidence supports the ALJ's foregoing analysis. The month before Dr. Patton drafted the above letter, stating that Claimant would have difficulty being employed due to chronic health conditions, Claimant complained that she suffered an exacerbation of mental health symptoms. (Tr. at 663). However, Dr. Patton noted that Claimant was taking her lithium incorrectly by ingesting it all in the morning rather than taking it three times per day. (*Id.*). Claimant's moods and manic symptoms significant improved when she took the medication correctly. (*Id.*). Claimant thereafter consistently reported the effectiveness of lithium for her mental symptoms. (Tr. at 25, 608, 711, 775, 852, 870). In addition, as late as March 2018, Dr. Patton also noted that Claimant's asthma was under control, she no longer used her CPAP, and she had lost a significant amount of weight and was largely following her diabetic diet. (Tr. at 608, 611). Further, as the ALJ indicated, Claimant's employment throughout the relevant period and her other activities belied Dr. Patton's assertion that Claimant had difficulty being gainfully employed due to chronic conditions.

Turning to the next treating opinion cited by Claimant, the ALJ also considered Dr. Holroyd's response to Claimant's attorney's interrogatories. Dr. Holroyd stated that Claimant's bipolar disorder would limit Claimant's ability to work on a consistent and competitive basis, but she was unsure whether Claimant could engage in competitive employment on a consistent basis because she did not know Claimant well enough to answer the question. (Tr. at 27, 841). The ALJ gave the statement little weight because Dr. Holroyd did not express specific functional limitations, and she indicated that she did not know Claimant well enough to give an opinion regarding Claimant's ability to engage in competitive employment. (Tr. at 27). Claimant fails to

identify an error in the ALJ's analysis of this evidence. Dr. Holroyd did not offer any opinion concerning Claimant's functional limitations. In addition, Claimant's improvement on lithium and her ability to maintain employment despite her bi-polar disorder were indicative of her ability to perform substantial gainful activity on a consistent basis.

Finally, the ALJ considered Ms. Wilson's opinion that Claimant could not engage in competitive employment on a consistent basis, as well as her assessments that Claimant had marked restrictions in interacting appropriately with the public, co-workers, and supervisors and responding appropriately to usual work situations and changes in the routine work setting. (Tr. at 27, 877, 879). However, the ALJ found that the opinions were not entitled to controlling weight because they were not well supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with other substantial evidence of record. (Tr. at 28). Thus, the ALJ analyzed Ms. Wilson's opinion according to the six regulatory factors. The ALJ noted that Ms. Wilson did not indicate how long she treated Claimant and there were no records of her treatment of Claimant in evidence. Thus, the ALJ could not assess the extent of the treatment relationship. (*Id.*). In addition, the ALJ discussed that Ms. Wilson assessed marked social limitations, but Claimant was consistently described as cooperative at medical appointments. (*Id.*). Claimant was also involved in her church and worked as a home health aide, both of which involved social interaction. (*Id.*). Regarding Ms. Wilson's assessment that Claimant had marked difficultly responding to usual work situations, the ALJ noted that Claimant worked on a consistent basis in 2017 and was working full time in January 2018. (*Id.*). After considering all of the factors, the ALJ determined that Ms. Wilson's opinion was entitled to little weight. (Tr.

at 29).

The ALJ's analysis of this evidence is likewise supported by the record. Although Claimant's psychiatrist referenced that Claimant was receiving therapy from Ms. Wilson and Claimant testified that she saw Ms. Wilson for many years, none of Ms. Wilson's records are in evidence. The ALJ justly concluded that it is difficult to ascertain the length and extent of the treatment relationship. Furthermore, as the ALJ found, Ms. Wilson's opinions that Claimant could not work and had marked mental functional limitations were inconsistent with Claimant's actual employment during the relevant period, conservative treatment, mental status examinations, and her other activities.

In sum, the record as a whole was inconsistent with the opinions of disability and marked limitations. Therefore, given the lack of supportability and consistency with the record, the ALJ's decision to reject the opinions that Claimant could not work and was severely functionally limited is amply justified. As the ALJ concluded, the determination of whether Claimant is disabled is an issue reserved to the Commissioner, and the opinions from her providers that she was disabled were not entitled to special deference. In addition, the ALJ's thorough analysis and explanation of the evidence provided more than adequate justification to give little weight to the opinions. Therefore, the undersigned **FINDS** that the ALJ properly considered the opinions from Claimant's treating providers, and the ALJ's assessment of the opinions is supported by substantial evidence.

### C. RFC

Claimant contends that a "more reasonable" assessment of the evidence demonstrates that she is disabled, or certainly that she could not perform work at the

medium exertional level. (ECF No. 10 at 6). SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id*. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id*. at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities

in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

In this case, the ALJ thoroughly discussed Claimant's allegations, treatment records, objective findings, test results, consultative examinations, daily activities, and the various opinions offered in this matter. (Tr. at 22-29). The only evidence cited in Claimant's brief includes the three statements from Claimant's treating providers concerning her ability to work. The ALJ specifically considered each of those opinions. Claimant does not identify any relevant functions or evidence that the ALJ overlooked in assessing her RFC, nor does she identify inadequacies in the RFC discussion that frustrate meaningful review. Rather, Claimant proposes that the Court independently review the record and reach a "more reasonable" conclusion that Claimant cannot work or that she is limited to working at a lower level of exertion. However, Claimant's proposed reasonability standard is not the standard that the Court employs in evaluating the ALJ's decision. The role of the Court is not to second-guess the ALJ's RFC assessment, but to review it, along with the record, to determine if the ALJ correctly applied the law and the decision is supported by substantial evidence. "Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. It consists of more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Colvin*, 639 F. App'x 921, 922 (4th Cir. 2016)

(quoting *Pearson v. Colvin,* 810 F.3d 204 (4th Cir.2015)). Importantly, the Court does "not reweigh conflicting evidence or make credibility determinations in evaluating whether a decision is supported by substantial evidence; rather, where conflicting evidence allows reasonable minds to differ, we defer to the Commissioner's decision." *Id.* (quoting *Hancock v. Astrue,* 667 F.3d 470, 472 (4th Cir. 2012) (internal markings omitted).

It is evident, here, that the ALJ considered the relevant evidence concerning Claimant's functional abilities and articulated a cogent, well-supported RFC assessment with specific citations to the record. The ALJ considered the evidence cited by Claimant, and all other evidence, in determining Claimant's RFC. Therefore, the undersigned **FINDS** that the ALJ's RFC assessment is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 10); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 11); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the

parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: July 7, 2020

Cheryl A. Eifert
United States Magistrate Judge

36